# EXHIBIT A

**IN THE COURT OF COMMON PLEAS HUNTINGDON COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | |
|---|---|
| SHIRLEY A. REICH | : |
| | : NO. 2014-556 |
| Plaintiff | : |
| | : |
| v. | : TERM: APRIL 2014 |
| | : |
| CITIGROUP, INC. and MORTGAGE ELECTONIC REGISTRATION SYSTEMS, INC. and RESIDENTIAL FINANCE CORP | : COMPLAINT |
| | : |
| Defendant(s). | : |
| | : Filed on behalf of Plaintiff |
| | : |
| | : Shirley A. Reich, Pro Se |
| | : |
| | : RD #1 Crestwood Estates |
| | : Huntingdon, PA 16652 |
| | : |
| | : Telephone (814) 643-2239 |

The Original of the Document has been filed in the Office of the Prothonotary/Clerk of Court on

MAY 06 2014

**IN THE COURT OF COMMON PLEAS HUNTINGDON COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

SHIRLEY A. REICH

NO.

Plaintiff

v.

TERM: APRIL 2014

CITIGROUP, INC. and MORTGAGE ELECTONIC REGISTRATION SYSTEMS, INC. and RESIDENTIAL FINANCE CORP

**COMPLAINT**

Defendant(s).

## NOTICE TO DEFEND

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within (20) days after this complaint and notice are served, by entering written appearance personality or by an attorney and filing in writing with the court your defense or objections to the claims set forth against you. You are warned that if you fail you do so the case may proceed without you and a judgment may be entered against you by the court and without further notice for any money claims in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. YOU SHOULD TAKE THIS PAPER TO YOURLAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FINDOUT WHERE YOU CAN GET LEGAL HELP.

<u>NOTICE TO DEFEND & LAWYER REFERRAL SERVICE</u>

NOTICE TO DEFEND
Lawyer Referral and Information Service
Philadelphia Bar Association
1101 Market Street
11th Floor
Philadelphia, PA 19107
Phone (215) 238-6333

LAWYER REFERRAL

Philadelphia Bar Association
1101 Market Street
11th Floor
Philadelphia, PA 19107
Phone (215) 238-6333

Shirley A. Reich, Pro Se
RD #1 Crestwood Estates
Huntingdon, PA 16652

Telephone (814) 643-2239

Plaintiff in Pro Se

| | |
|---|---|
| SHIRLEY A. REICH | : IN THE COURT OF COMMON PLEAS<br>: HUNTINGDON COUNTY, PENNSYLVANIA |
| | : |
| Plaintiff | : NO. |
| | : |
| v. | : TERM: APRIL 2014 |
| | : |
| CITIGROUP, INC. and MORTGAGE ELECTONIC REGISTRATION SYSTEMS, INC. and RESIDENTIAL FINANCE CORP | :<br>:<br>: COMPLAINT<br>: |
| | : |
| Defendant(s). | : |

**NOW COMES** Plaintiff, Shirley A. Reich by and through herself and files the following Complaint in Civil Action seeking relief against the above named Defendants and in support thereof states as follows:

## I. PRELIMINARY STATEMENT

1. The underlying matter involves fraudulent, illegal, unfair and deceptive business practices engaged in by Plaintiff Citigroup, Inc., (hereinafter, "CITI"), through a set of jointly controlled policies and practices that violate contract, state and federal law. The facts in this case reveal the harsh reality that underlies CITI's press statements about its own involvement a party to a national settlement regarding its well documented foreclosure problems, including but not limited to shoddy paperwork; robo-signing; creation of a mirage of mortgage ownership; inability of the courts to determine the actual owners of mortgages and notes; and the disproportionate impact of CITI's foreclosures upon minorities

2. To date: Defendant CITI has not provided nor demonstrated that it is a "Holder In Due Course" of any negotiable instrument granting good title to the Plaintiff's property (such as a valid assignment of Mortgage or Note).

3. The Commonwealth of Pennsylvania requires actions to be prosecuted by and in the name of a real party in interest. Pa.R.C.P. No. 2002(a). A party is in real interest if it has the legal right under the applicable law to enforce the claim in question. *Deutche Bank Nat'l Trust Co. v. Smith* (Pa. C.P. 2010). It is constitutionally mandated that evidence of standing is a condition precedent to the resolution of any further issues and good title is a condition precedent to obtaining possession.

4. Plaintiff would ask of this Court apply the law in a manner which yields to CITI's expediency and convenience with respect to this foreclosure action and further disregard that CITI like many lending institutions fail to follow proper procedures which would allow it to (1) ensure the reliability of its own claimed chain of ownership, (2) secure dependable transfer of property, and (3) comply with Pennsylvania's rules that govern real property.

## II. BACKGROUND AND STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION

5. Plaintiff incorporates by reference each of the preceding paragraphs as if fully restated herein.

6. Currently and at all times relevant herein, Plaintiff is the real owner of said residence.

7. On August 30, 2005, in consideration of a loan in the principal amount of $136,000, Plaintiff executed and delivered in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as Nominee for CITI a Note. An alleged copy of said Note is marked Exhibit "A."

8. To secure the obligations under the Note, Plaintiff executed and delivered to CITI a mortgage, recorded on August 30, 2005, in the Office of the Recorder of Deeds Huntingdon County, Mortgage instrument No. 500684595. A copy of said Mortgage is marked Exhibit "B."

9. Because Plaintiff's down payment for the purchase of the above referenced property was less than 20 percent its appraised value and/or sale price, Plaintiff was required by CITI to obtain Private mortgage Insurance ("PMI"). The purpose of Plaintiff's PMI was to protect CITI against any default on the loan.

**The "Citigroup, Inc. – Residential Finance Corp" Business Relationship**

10. CITI was the original lender and owner of Plaintiff's Mortgage.

11. Plaintiff believes that the current, true owner and holder of her Mortgage and Note is the Residential Finance Corp ("Residential").

12. Residential Finance Corp is a financial enterprise that was created for mortgage monies and securities. Residential is a publicly traded company which operates under a charter to channel its efforts into increasing its availability of servicing residential home mortgages. Plaintiff further avers that Residential purchases and guarantees mortgages that meet its funding criteria. Through this process it secures mortgages to form mortgage-backed securities ("MBS"), pension funds, insurance companies and foreign governments are among the investors in Residential's MBS. Residential also holds a large portfolio of its own and other institutions MBS's, known as its retained portfolio.[1]

13. Residential maintains a public website with a loan look up tool on its home page located at www.residentialfinancecorp.com. The loan look up tool allows the user to find out whether or not their mortgage is owned by Residential. According to Residential loan look up

[1] http://www/federalreserve.gov/econresdata/releases/mortoutstand/mortoutstand20090331.htm

tool, Plaintiff's loan is owned by Residential. Attached hereto ad marked Exhibit "C" is a printout form the Residential public website confirming Plaintiff's loan to be an asset of Residential.

14. Additionally, a securitization company has confirmed that Plaintiff's Mortgage loan had been securitized into a certain trust or pool at the time it was executed and that their loan was sold by Citigroup, shortly after its execution.

15. According to Residential's website, if it owns a particular loan, that borrower's loan has in fact been purchased from the original lender by Residential. In the case, Residential was paid an unknown sum of money, at which point Citigroup became Plaintiff's servicer on behalf of Residential. A copy of said Averment is marked Exhibit "D," attached hereto and made part hereof.

16. Citigroup used what is now termed the "originate-to-distribute" model. Here, Citigroup, sold Plaintiff's mortgage to Residential. It was Residential who then packaged Plaintiff's Mortgage and Note into a mortgage-backed security ("MBS"), which in most cases would have been sold to other investors, a process referred to as securitization. However, in this case, Residential appears to have retained Plaintiff's Mortgage and Note.

17. At the time of Plaintiff signed the Note and Mortgage, they were was unknowingly converting her property into an asset of a trust or Pool, which is actually a MBS, an investment vehicle, defined an regulated by the Security and Exchange Commission ("SEC"). Citigroup, the alleged loan originator, upon execution immediately and simultaneously securitized the Note and Mortgage and no longer held an interest in either. Plaintiff was never informed of the nature of the arrangement. Plaintiff was deliberately induced into signing a negotiable instrument which was never intended as such, but was intended as collateral for

MERS. The fact that the Mortgage loan was meant to find an MBS was a "material disclosure" which was intentionally undisclosed.

18. Due to the way Residential securitizes and allows MERS to transfer its loans behind the scenes, it is not possible to convey the specific details as to what Trust and Real Estate Mortgage Investment Conduit ("REMIC") the loan is currently in.[2]

**Citigroup – as "Servicer"**

19. Although shortly after Citigroup originated Plaintiff's Mortgage and quickly sold the loan to Residential, it appears that Residential was nonetheless employed by Residential to service Plaintiff's loan. It is uncertain whether Residential was a "Master Servicer," "Subservicer" or "Special Servicer" as the terms are defined by 24 C.F.R. § 3500.21. While the duties of a particular mortgage servicer are varied, typically a servicer will be responsible for such things as: acceptance and recording of mortgage payments; payment of taxes and insurance from a borrower's escrow accounts; negotiable of workouts and modifications of mortgage upon default; and conducting and/or supervising the foreclosure process when authorized to do so.

**Bank of America's Lack of Standing and Unlawful Conduct**

20. Plaintiff would like to direct the Court's attention to two key facts: (1) The Act 91 Notice mailed to Plaintiff on or around December 17, 2013fails to identify the mortgage and/or lender of Plaintiff's loan. The notice does however identify Citigroup as the loan servicer, (2) Defendant Citigroup claims to be the current owner of Plaintiff's Mortgage and Note, and not Servicer on behalf of Residential. Plaintiff avers that Citigroup's commission of any referenced

[2] Real Estate Mortgage Investment Conduits create customized structuring of mortgage pass-through securities to redistribute cash flows and cater to a variety of market demands.

to the then Mortgage and/or Residential was calculated to further confuse both the Court and Plaintiff.

21. Citigroup claims that it is the Assignee and owner of Plaintiff's Mortgage by way of a valid assignment from MERS as nominee for Citigroup.

22. Based upon information and belief for all times relevant herein and beginning on December 17, 2013 or around Plaintiff's alleged default, Citigroup reported to credit bureaus that Plaintiff was in default of the Note. Defendant knowingly and willfully prepared, signed, and recorded a fraudulent mortgage assignment within the public records and Courts and Commonwealth falsely claiming that MERS transferred both the Note and Mortgage to Citigroup.

23. According to MERSCORP website, the investor of the Note is identified as Residential. A print of this averment from MERSCORP's website is marked Exhibit "E," attached hereto and made a part hereof.

24. Plaintiff further avers that the Assignment of Mortgage is of fraudulent nature and questionable origin. Specifically Gregory Klein is not an appropriate party to lawfully sign such assignments on behalf of MERS solely as nominee for Citigroup. Plaintiff calls the Court's attention to the language of the purported mortgage document which indicates MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns . . . , MERS is the Mortgage of Record. (Emphasis added) At what point, if ever, did MERS become the actual lender remains a mystery and is not disclosed. Moreover, the recording coversheet with the Office of Recorder of Dees, Huntingdon County, identifies the mortgage as Citigroup with no reference to MERS whatsoever. A copy of said coversheet is marked Exhibit "A."

25. Plaintiff believes that Gregory Klein the alleged assistant secretary of MERS is actually an employee of Citigroup.

26. Plaintiff believes and therefore avers, that the purported assignment of Mortgage was signed by Gregory Klein on January 7, 2014 without any supporting documentation to substantiate his authority to do so.

27. Plaintiff believes that said Assignment was knowingly executed to defraud them because Gregory Klein is neither an employee, agent or officer of Residential, the current investor and current owner of Plaintiff's mortgage. Gregory Klein, the assignor, at the direction of Defendant, acted under the duel capacity of both the assignor and the assignee. Therefore, there never existed two distinct parties to this transaction according to the documents recorded. It is inconceivable how Gregory Klein could be an employee of both the assignor and comply with the requirements of 13 Pa.C.S. § 9101 et seq. Essentially, Citigroup assigned Plaintiff's Mortgage to itself without the power to do so.

28. Plaintiff believes that Julie Carol, Notary Public, is actually an employee of Citigroup as well.

29. Citigroup directed its employees Gregory Klein and Julie Carol whom in this case has no personal knowledge of the facts stated in the assignment document assign and notarized said loan documents allegedly transferring ownership of Plaintiff's mortgage, although they are not in fact employees of MERS. Robo-signers Klein and Carol were essential in executing the fraud underlying Defendant improper activities against Plaintiff.

30. To the extent that Gregory Klein is a Assistant Secretary of MERS as stated within the Assignment document, Plaintiff avers that Klein, an employee of Defendant would

have a serious conflict of interest as an officer both the Assignor MERS and the Assignee Citigroup in the instant case.

31. Plaintiff hereby avers that the Assignment of Mortgage in the case at bar to be a fraudulent document fabricated and presented under oath subject to penalty of perjury with the intention and purpose of misleading the Court, Plaintiff and the public at large.

32. In the instant case, Citigroup's deliberate act of crafting or causing to craft a bogus assignment of mortgage to fool the Court does not create standing where clearly none exists.

33. Citigroup, which alleges to own Plaintiff's mortgage and note, is a third party and has no pecuniary or beneficial interest in Plaintiff's loan documents. The true owner of the Mortgage loan has not declared default. Citigroup as servicer alleged owner of Plaintiff's mortgage is not in privity nor has it presented evidence that it is authorized to foreclose on behalf of Residential.

34. One element of the fraud is to keep the name of the trust, or the beneficiaries of the mortgage loan, from ever being revealed. Citigroup fraudulently retains the proceeds of a foreclosure sale even doing so when the trust no longer exists or has been paid off by an investor through credit default swap insurance.[3] In particular, credit default swap on mortgage-backed securities allow securitizers such as Citigroup and investors such as Residential to hedge the credit risk of the underlying sub-prime loans. Through this fraudulent scheme the court and the property owner will never be the wiser.

[3] Credit default swaps are insurance contracts where the buyer pays a premium to the seller who in the event of default must compensate the buyer for the differences between the principal insured and the amount recovered. Purchases of credit default swaps (CDS) on mortgage-backed securities (MBS) are compensated in the event of defaults on loans in mortgage pools underlying the MBS tranches. Note that the purchaser of protection (the entity with the long position) and the seller asset referenced in the CDS contract. As such, the sum of the notional principal on any single referenced asset (e.g., an MBS tranche or a corporate bond) can be may times the principal of the asset.

35. MBS's are covered by insurance policies, commonly referred to as derivative or collateral contract. These derivative contracts are not recorded or regulated by SEC. The actual derivative contract is for more and up to ten times, the face value of the MBS.

36. To the extent of the Plaintiff's loan is part of a pool of loans as an MBS, the identity of the Residential pool or Trust may be the true owner of the Plaintiff's mortgage loan.

37. It is believed that Citigroup retained proceeds of Plaintiff's mortgage payments without he knowledge.

38. Plaintiff avers that most likely Residential has already been compensated by Citigroup and/or another unidentified entity pursuant to the term of its Credit default insurance.

39. Plaintiff further avers that Citigroup has already been or is likely to receive compensation due to Plaintiff's alleged default pursuant to the terms of Plaintiff's Private Mortgage Insurance.

40. In any event, both Citigroup and/or Residential have already been identifies due to Plaintiff's alleged default pursuant to the terms of the various insurance policies associated with Plaintiff's loan.

41. Although, Defendant Citigroup knows of its hereinbefore mentioned conduct, it continues to harass Plaintiff demanding payment.

42. Because Citigroup is not the true owner and holder of the Mortgage and Note, it is a debt collector as the term is defined under the FDCPA.

43. It is evident from the attached exhibits that Residential is the true owner and real party in interest with respect to Plaintiff's loan.

44. As a debt collector, Citigroup violated the FDCPA by, among other things, fraudulently representing that it is the true and owner and holder of Plaintiff's Mortgage and Note.

45. Plaintiff avers that the Note attached herein is simply unendorsed and s therefore not bearer paper. Citigroup has not supplied this Court with any documentation to substantiate itself as a holder as pursuant to Pennsylvania's UCC.

46. Citigroup has deceptively identified itself as a debt creditor and in doing so, failed to join the Holder or the Owner of the mortgage loan as an indispensible party.

47. As documented above, Defendant knowingly engaged in a systematic scheme.

48. Citigroup breached its duty of care by making, or causing to be made, misrepresentations of material facts relating to their interest in Plaintiff's Mortgage and Note and the declaration of default upon Plaintiff.

49. Plaintiff has experienced, and continues to experience, an inordinate and unwarranted amount of stress, and injury to her credit, as a result of Defendant's actions.

50. Defendant's actions have caused Plaintiff actual damages, including but not limited to economic damages in the form of denial of credit, loss of her property, and non-economic damages in the form of aggravation, humiliation, embarrassment, depression, strain on personal relationships, sleeplessness, worry, anxiety and legal expense.

51. In addition to damages, Defendant's actions have created and continue to create a permanent cloud on Plaintiff's title and land records in relation to the title illegally divested in Citigroup.

**COUNT ONE: VIOLATION OF FAIR DEBT COLLECTIONS PRACTICES ACT**

52. Plaintiff incorporates by reference each of the preceding paragraphs as if fully restated herein.

53. The financial obligation originally owed to Citigroup by Plaintiff is a debt as the term is defined by the FDCPA 15 U.S.C. § 1692a(5).

54. Defendant Citigroup is a debt collector within the meaning of the fair Debt Collection Practices Act ("FDCPA").

55. Defendant's foregoing acts in attempting to collect this debt constitutes violations of the FDCPA, including but not limited to the following sections:

i. § 1692d – any conduct the natural consequence of which is to harass, oppress, or abuse any person;

ii. § 1692e(2) – any false, deceptive, or misleading representation or means in connection with the debt collections;

iii. § 1692e(4) – misrepresenting the character, amount or legal status of n alleged debt;

iv. 1692e(4) – the representation or implication that nonpayment of any debt will result in the seizure or sale of any property unless such action is lawful;

v. § 1692e(5) – threaten to take any action that cannot legally be taken or that is not intended to be taken;

vi. § 1692e(10) – the use of any false representation or deceptive means to collect or attempt to collect any debt;

vii. § 1692f – any unfair or unconscionable means to collect or attempt to collect the alleged debt;

viii. § 1692f(1) – attempt to collect any amount not authorized by the agreement creating the debt or permitted by law.

56. Because Citigroup is not the true owner and holder of the Mortgage and Note it is a debt collector as the term defined under the FDCPA.

57. As a debt collector, Citigroup violated the FDCPA by, among other things, fraudulently representing that it is the true owner and holder.

58. As a debt collector, Citigroup violated the FDCPA, because both Citigroup and/or Residential have already been indemnified due to Plaintiff's alleged default pursuant to the terms of the various insurance policy associated with Plaintiff's loan.

59. Defendant undertook a willful course of conduct all of which the natural consequence was to harass, oppress, and abuse Plaintiff; Citigroup claimed an interest and ownership of the Mortgage and default. Additionally, Citigroup misrepresented the legal status of the alleged mortgage debt.

60. Citigroup's violation of the FDCPA proximately caused serious and continuing injury and damages to Plaintiff, including loss of credit standing, and other cost.

61. Plaintiff was harmed by Defendants violations and are entitled to statutory damages, actual damages, legal fees and costs pursuant to 15 U.S.C. § 1692k(a).

62. Because the conduct of the Defendants and the nature of the violations of the FDCPA are so egregious, and that the FDCPA violations were part of a deliberate scheme, Plaintiff is entitled to the maximum possible relief permitted.

**COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT**

63. Plaintiff incorporates by reference each of the preceding paragraphs as if fully restated herein.

64. Citigroup has violated provisions of the Fair Credit Reporting Act 15 U.S.C. § 1618 et seq., by falsely misrepresenting a debt against Plaintiff, falsely reporting that Plaintiff owe money to Citigroup, falsely reporting to credit bureaus that Plaintiff is in default on a mortgage loan, falsely reporting to credit bureaus that Citigroup owns Plaintiff's mortgage and threatening legal actions against Plaintiff.

65. As a direct and proximate result of Defendant's actions, Plaintiff has suffered actual damages and is entitled to actual and statutory damages, legal fees and costs.

**COUNT THREE: VIOLATION OF PENNSYLVANIA UNIFORM COMMERCIAL CODE §§ 3201,3302**

66. Plaintiff incorporates by reference each of the preceding paragraphs as if fully restated herein.

67. Article 3 of the Uniform Commercial Code, which has been adopted in every state, including Pennsylvania at 13 Pa.C.S. § 3104 governs negotiable instruments, specifically defining what a negotiable instrument is an how ownership of such paper is transferred. § 3104(a) for a writing to be negotiable instrument it must:

> (a) Contain an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order; and
>
> (1) is payable to bearer or to order at the time it is issues or first comes into possession of a holder;
>
> (2) be payable on demand or at a definite time; and
>
> (3) does not state any other undertaking or instructions by the person promising or ordering payment to do any act in addition to the payment of money.

68. Ordinary negotiable instruments include mortgage notes. See §§ 3140(e) Negotiable papers is transformed from the original payor by negotiation, § 3201(a). "Order

paper" must be endorsed; bearer paper need only be delivered. § 3201(b). However, in either case, for the note to be enforced, the person who asserts the status of the holder must be in possession of the instrument. 13 Pa.C.S. § 3201(a).

69. Original and subsequent transferees are referred to as holders, (See § 3301(a)). The Pennsylvania UCC provides that a payment to a party entitled to enforce the instrument is sufficient to extinguish the obligation of the person obligated on the instrument. Clearly, then, only a holder – a person in possession of either a note which is endorsed to it *or* a holder of bearer paper – may seek satisfaction or enforce rights in collateral such as real estate.

70. Plaintiff believes that the Note Defendant possesses is simply unendorsed and is therefore not bearer paper. Citigroup has not supplied this court with any documentation to substantiate itself as a holder as required under the Pursuant to Pennsylvania's UCC.

71. Plaintiff believes and further avers that because both Citigroup and more importantly, Residential has already been indemnified and/or compensated due to Plaintiff's alleged default pursuant to the terms of the various insurance policies associated with Plaintiff's loan. In any event, receipt of payment by a party entitled to enforce the instrument is sufficient to extinguish the obligation of the person obligated on the instrument, (See § 3601(a)).

72. Citigroup has deceptively identified itself as a creditor and in doing so, failed to join the holder or the Owner of the mortgage loan as an indispensible party.

**COUNT FOUR: VIOLATION OF THE PENNSYLVANIS UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

73. The allegations in each of the above paragraphs are incorporated herein by reference.

74. 73 Pa. Stat. Ann. § 201-1 et seq. Unfair Trade Practices and Consumer Protection Law ("UTPCL"), prohibits any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding as an unfair or deceptive practice. id.

75. Defendant's practiced constitute acts of trade or commerce within the menaing of 73 P.S. § 201-2(3).

76. Defendant's practices constitute deceptive conduct that created a likelihood of confusion and/or misunderstanding within the meaning of 73 P.S. § 201-2(4).

77. As documented above, Defendant knowingly engaged in a systematic scheme to (a) attempt foreclosure on the basis of untrue assertions of fact in court filings and property records, some of them containing robo-signatures and a sham notarization, each of the above representations were all intended to create the false appearance of legal standing to bring this residential mortgage foreclosure against Plaintiffs; and (b) in the instant case, the false, misleading and wholly inaccurate information as to the identity of the owner of the Plaintiff's loan was carried out by Citigroup and third parties involved with the fabrication of documents. Such acts are not simple mistakes but egregious acts of fraud upon the Court.

78. Defendant's systematic deceptive misconduct has directly, foreseeably and proximately caused ascertainable damages and injuries to Plaintiff, in an amount not currently quantified. These damages and injuries include, inter alia, (a) payment of legal fees and costs to their own counsel to challenge Defendant's false standing and/or Defendant's attempt to seize her property through a foreclosure action brought in its name; (b) loss of credit standing and (c) concealed material facts known to them but not to Plaintiffs. Citigroup intentionally withheld the truthful status of Plaintiff's Note and Mortgage with the intent to defraud Plaintiff.

79. Defendant made the above-referenced false representations, concealment and non-disclosures with knowledge of said misrepresentations. Defendant intended to induce Plaintiff's reliance on said misrepresentations and non-disclosures whereby it would improperly acquire a security interest in and title to Plaintiff's residence, which unsuspecting Plaintiffs justifiably relied upon, resulting in cost and possible loss of her property.

80. Defendant's misconduct constitutes acts and employment of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations of material fact, or the concealment, suppression or omission of material facts with the intent that other rely upon them, which created a likelihood of confusion and misunderstanding as an unfair and deceptive practice in regards to Plaintiff's real estate in violation of UTPCPL.

81. The improper, illegal and abusive debt collection practiced committed by Defendants are in violation of the Fair Debt Collection Practices Act, which also constitutes unfair and deceptive practices in violation of the UTPCPL.

82. As a direct and proximate result of Defendant's fraudulent misrepresentations of material fact, Plaintiff has sustained actual and statutory damages under 73 Pa. Stat. Ann. § 201-8, together with reasonable legal fees and costs of prosecuting this action.

**COUNT FIVE: WRONGFUL FORECLOSURE**

83. The allegations in each of the above paragraphs are incorporated herein by reference.

84. On or about December 17, 2013, Citigroup caused to be filed in the Office of the Recorder Huntingdon County a fraudulent and therefore, invalid Assignment of Plaintiff's Mortgage.

85. Plaintiff is informed and believes that after the origination and funding of her loan, it was sold or transferred to investors or other entities and that Citigroup did not validly own or possess either Plaintiff's Mortgage or corresponding Note at commencement of the foreclosure action.

86. Accordingly, Citigroup did not have the right to declare default, cause notices or default to be issued or recorded, or foreclosure on Plaintiff's interest in the Subject Property.

87. Citigroup was not the legal holder of Plaintiff's Note or a true beneficiary at any time with regard to said loan due to the fact the Residential purchased Plaintiff's loan from Citigroup shortly after its origination.

88. Plaintiff further alleges on information and belief that her mortgage loan was sold or transferred without notifying her in writing. Therefore, Citigroup is without legal right to enforce the Mortgage and/or Note.

89. Consequently, Citigroup does not have the legal authority to commence a wrongful foreclosure action of the subject property.

**COUNT SIX: NEGLIGENCE**

90. The allegations in each of the above paragraphs are incorporated herein by reference.

91. Defendant owed Plaintiff a duty of reasonable care while serving her loan.

92. As documented above, Defendant breached its duty of care by making, or causing to be made, misrepresentations of material fact relating to their interest in Plaintiff's Mortgage and Note and the declaration of default upon Plaintiff.

93. As documented above, Defendants also breached their duty of care by making, or causing to be made, misrepresentations of material fact in the purported assignment of the Mortgage and Note.

94. While there is abundant evidence demonstrating that Defendant made the foregoing misrepresentations of material fact with illegal and/or fraudulent intent, these misrepresentations and omissions were, at minimum, negligently made.

95. As a direct and proximate cause of Defendant's negligence, Plaintiff sustained damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that:

A. Defendant's conduct be determined to have violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(5);

B. Defendant's conduct be determined to have violated the Fair Credit Reporting Act 15 U.S.C. § 1681 et seq.;

C. Defendant's conduct be determined to have violated Pennsylvania's Uniform Commercial Code, 13 Pa.C.S. § 3104 et seq.;

D. Defendant's conduct be determined to have violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq.;

E. Defendant be found liable to Plaintiff for wrongful foreclosure;

F. Defendant be found liable to Plaintiff under the common law of the Commonwealth of Pennsylvania for negligence;

G. Judgment that any Promissory Notes or Mortgage, related to the subject property be declared null and void and of no further force and effect in regards to Citigroup's claimed interest;

H. Judgment prohibiting Citigroup from commencing a foreclosure action;

I. Plaintiff has such other relief that the Court may deem just and proper.

Dated: ~~April~~ __, 2014
May 6

Respectfully Submitted,

Shirley A. Reich

By: Shirley A. Reich

60.50

I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office of HUNTINGDON COUNTY, PENNSYLVANIA

RECORDER'S OFFICE HUNTINGDON COUNTY, PA

Janet E. Hanks
Recorder of Deeds

BK 771 PG 0487

ENTERED
HUNTINGDON COUNTY
PENNSYLVANIA
R. Locke
AUG 31 11 41 AM '05
60.50
JANET E. HANKS
RECORDER OF DEEDS

This Instrument Prepared By:
RESIDENTIAL FINANCE CORPORATION

After Recording Return To:
RESIDENTIAL FINANCE CORP
401 N. FRONT STREET, SUITE 300
COLUMBUS, OHIO 43215
Loan Number: 500684595

Uniform Parcel Idendifier Number: 23-02A-04

Property Address: RD #1 CRESTWOOD ESTATES
HUNTINGDON, PENNSYLVANIA 16652

005749

[Space Above This Line For Recording Data]

# MORTGAGE

MIN: 1001893-0508004944-2

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated AUGUST 30, 2005 , together with all Riders to this document.

**(B) "Borrower"** is SHIRLEY A REICH, AN UNMARRIED WOMAN

Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is RESIDENTIAL FINANCE CORP

Lender is a OHIO CORPORATION organized

BK 771 PG 0488

Loan Number: 500684595

Date: AUGUST 30, 2005

Property Address: RD #1 CRESTWOOD ESTATES, HUNTINGDON, PENNSYLVANIA 16652

## EXHIBIT "A"

## LEGAL DESCRIPTION

**ALL** that certain tract of land situate in Juniata Township, Huntingdon County, Pennsylvania, more particularly bounded and described as follows:

**BEGINNING** at a point located on the Southern boundary of a private right of way known as Brandy Drive, said right of way being 33 feet in width; thence along the said right of way North 47 degrees 39 minutes 08 seconds East 37.90 to a point; thence continuing along the Southern boundary of said right of way North 45 degrees 25 minutes 18 seconds East for a distance of 160.03 feet to a point on the Southern boundary of the right of way of Crestwood Drive (T-443); thence along the right of way of Crestwood Drive South 68 degrees 16 minutes 37 seconds East for a distance of 249.86 feet to a point located at the intersection of Crestwood Drive and Raystown Drive; thence along the Western boundary of the right of way of Raystown Drive (T-445) South 13 degrees 54 minutes 47 seconds West for a distance of 27.33 feet; thence continuing along the right of way of Raystown Drive in a curve to the right South 32 degrees 52 minutes 47 seconds West for a distance of 172.05 feet, said curve having a radius of 259.87 feet; thence continuing along the right of way of Raystown Drive South 51 degrees 50 minutes 46 seconds West for a distance of 95.10 feet to a point located at the common boundary of the lands now or formerly of Richard P. Fogel and Elsie Z. Fogel; thence along the lands now or formerly of Fogel North 48 degrees 02 minutes 12 seconds West for a distance of 267.94 feet; thence continuing along the lands now or formerly of Fogel North 34 degrees 50 minutes 35 seconds West for a distance of 3.18 feet to a point, the place of beginning.

**UNDER AND SUBJECT** to all mutual, beneficial restrictions, reservations, covenants, conditions and charges collectively referred to as "restrictions" which shall run with the land herein conveyed and more specifically set forth in a declaration of reservations, restrictions and covenants running with the land of Robert Hornbaker, known as Crestwood Estates, all of which restrictions were recorded in the Office of the Recorder of Deeds of Huntingdon County in Miscellaneous Book 79, Page 149, on July 7, 1970, with addendum to declaration of reservations dated May 10, 1971 and recorded in the Office of the Recorder of Deeds of Huntingdon County in Miscellaneous

A.P.N. # : 23-02A-04

Loan Number: 500684595

Date: AUGUST 30, 2005

Property Address: RD #1 CRESTWOOD ESTATES, HUNTINGDON, PENNSYLVANIA 16652

## EXHIBIT "A"

## LEGAL DESCRIPTION

Book 80, Page 564, on May 17, 1971; and further addendum to declaration of reservations dated October 27, 1976 and recorded in the Office of the Recorder of Deeds of Huntingdon County in Miscellaneous Book 93, Page 941, on February 17, 1977.

**BEING** the same tract of land title to which became vested in Robert Hornbaker and Mary Ruth Hornbaker, husband and wife, Grantors herein, by Corrective Deed of Robert Hornbaker and Mary Ruth Hornbaker, dated July 13, 2005 and recorded in the Office of the Recorder of Deeds of Huntingdon County in Record Book 764 at Page 940 on July 13, 2005. The purpose of said Corrective Deed was to correct the description as set forth in the hereinafter referenced deed, being reported as tract #3 in said deed.

**THE TRACT OF LAND HEREINBEFORE DESCRIBED** has been previously described in the Deed recorded in the Office of the Recorder of Deeds of Huntingdon County in Record Book 252, Page 220, said Deed being dated the 23rd day of January, 1990, being reported as Tract #3 in said Deed, as follows:

**BEGINNING at a point,** being an oak stake at the northwestern corner of the intersection of Crestwood Drive with Raystown Drive; thence North 78 degrees 30 minutes West 98.5 feet to a point; thence North 66 degrees 30 minutes West 152 feet to a point; thence South 43 degrees 30 minutes West 202 feet to a point; thence South 33 degrees 30 minutes East 54.4 feet to a point; thence South 58 degrees 30 minutes East 225.5 feet to a point on the western right of way of Raystown Drive; thence following the western right of way of said Raystown Drive, North 49 degrees 43 minutes East 89.3 feet to a point; thence North 36 degrees 40 minutes East 100 feet to a point; thence North 15 degrees 22 minutes East 100 feet to a point and the place of beginning. CONTAINING 1.26 acres and being Lot No. C-3 in the plan of lots to be known as Crestwood Estates.

A.P.N. # : 23-02A-04

DocMagic eForms 800-649-1362
www.docmagic.com

EXHIBIT

BK 771 PG 0490

and existing under the laws of OHIO
Lender's address is 401 N. FRONT STREET, SUITE 300, COLUMBUS, OHIO 43215

(E) "Note" means the promissory note signed by Borrower and dated AUGUST 30, 2005. The Note states that Borrower owes Lender ONE HUNDRED THIRTY-SIX THOUSAND AND 00/100 Dollars (U.S. $136,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than SEPTEMBER 1, 2035.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify]
☐ 1-4 Family Rider ☐ Biweekly Payment Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument,

BK 771 PG 0491

"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY of HUNTINGDON :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 23-02A-04

which currently has the address of RD #1 CRESTWOOD ESTATES
[Street]

HUNTINGDON , Pennsylvania 16652 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower

to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.

During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

BK 771 PG 0496

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument,

including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent,

Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given

to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this

BK 771 PG 0502

Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

**25. Reinstatement Period.** Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

**26. Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

**27. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Shirley A. Reich (Seal)
SHIRLEY A REICH -Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

Witness:
Ronald J. Locke

Witness:
_______________

BK 771 PG 0503

COMMONWEALTH OF PENNSYLVANIA )
) SS:
COUNTY OF HUNTINGDON )

On this the 30th day of August, 2005 , before me, Phyllis A. Horning,

the undersigned officer, personally appeared SHIRLEY A REICH

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seals.

Phyllis A. Horning Signature

Notarial Seal
Phyllis A. Horning, Notary Public
Huntingdon Boro, Huntingdon County
My Commission Expires Feb. 5, 2007

Title of Officer

(Notary's Stamp and Embosser)

My commission expires:

BK 771 PG 0504

**Certificate of Residence of Mortgagee**

The undersigned hereby certifies that: (i) he/she is the Mortgagee or the duly authorized attorney or agent of the Mortgagee named in the within instrument; and (ii) Mortgagee's precise residence is:
401 N. FRONT STREET, SUITE 300, COLUMBUS, OHIO 43215

MERS: P O Box 2026 Flint MI 48501-1016
Witness my hand this 30th day of August, 2005.

Ronald J. Locke, P.C.
Signature of Mortgagee or Mortgagee's Duly Authorized Attorney or Agent

RONALD J. LOCKE, P.C.
Type or Print Name of Mortgagee or Mortgagee's Duly Authorized Attorney or Agent



Recorded AUG 31 2005
Janet E. Hanks, Recorder of Deeds

MIN: 1001893-0508004944-2 **NOTE** Loan Number: 500684595

AUGUST 30, 2005 COLUMBUS OHIO
[Date] [City] [State]

RD #1 CRESTWOOD ESTATES, HUNTINGDON, PENNSYLVANIA 16652
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 136,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is RESIDENTIAL FINANCE CORP, AN OHIO CORPORATION .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.250 %.

~~The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.~~

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on OCTOBER 1, 2005 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on SEPTEMBER 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 401 N. FRONT STREET, SUITE 300, COLUMBUS, OHIO 43215 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 837.38 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

Rd #1 Crestwood Estates Huntingdon, PA 16652

500684595

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

500684595

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Shirley A Reich (Seal) -Borrower
SHIRLEY A REICH

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

500684595

Rd #1 Crestwood Estates Huntingdon, PA 16652

PAY TO THE ORDER OF:
FLAGSTAR BANK, FSB WITHOUT RECOURSE

RESIDENTIAL FINANCE CORP, AN OHIO CORPORATION

BY: Kindra G. Freeman
Kindra G. Freeman

ITS: Funding manager

840098

*[Sign Original Only]*

[redacted]

CERTIFIED MAIL™

7013 0600 0000 5257 7021

PRIORITY® MAIL

UNITED STATES POSTAL SERVICE

Visit us at usps.com

Label 106A, May 2008

FROM:

U.S. POSTAGE PAID
HUNTINGDON, PA
16652
MAY 07, 14
AMOUNT
$11.60
00019716-09

1021 17101

UNITED STATES POSTAL SERVICE

Visit us at usps.com

Label 106A, May 2008

PRIORITY® MAIL ★

DATE OF DELIVERY SPECIFIED*

USPS TRACKING™ INCLUDED*

INSURANCE INCLUDED*

PICKUP AVAILABLE

* Domestic only

IF USED INTERNATIONALLY, CUSTOMS DECLARATION LABEL MAY BE REQUIRED.

RETURN RECEIPT REQUESTED

TO:

[redacted]

PRIORITY® MAIL

UNITED STATES POSTAL SERVICE

For Domestic and International Use

From Shirley Reich
11329 Brandy Dr
Huntingdon, Pa.
16652

TO CT Corporation System
116 Pine St
STE 320
Harrisburg, Pa. ~~1665~~ 17101

Label 228, January 2008

Packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F ©U.S. Postal Service; July 2013; All rights reserved.

CT Corporation

**Service of Process Transmittal**
05/09/2014
CT Log Number 524924404

**TO:** Russum Abidally, Manager
Citigroup Inc.
Legal Service Intake Unit, 1 Court Square
10th Floor, Zone 4
Long Island City, NY 11120

**RE:** **Process Served in Pennsylvania**

**FOR:** Citigroup Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Shirley A. Reich vs. Citigroup, Inc., et al., Dfts.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Complaint(s), Notice, Exhibit(s) |
| **COURT/AGENCY:** | Huntingdon County - Court of Common Pleas, PA<br>Case # 2014556 |
| **NATURE OF ACTION:** | Wrongful Foreclosure - Huntingdon County, PA |
| **ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Harrisburg, PA |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 05/09/2014 postmarked on 05/07/2014 |
| **JURISDICTION SERVED :** | Pennsylvania |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service |
| **ATTORNEY(S) / SENDER(S):** | Shirley A. Reich, Pro Se<br>RD #1 Crestwood Estates<br>Huntingdon, PA 16652<br>814-643-2239 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 05/09/2014, Expected Purge Date: 05/14/2014<br>Image SOP<br>Email Notification, Russum Abidally russum.abidally@citi.com<br>Email Notification, Carol Dover carol.e.dover@citi.com<br>Email Notification, Tonya Huggup tonya.s.huggup@citi.com |
| **SIGNED:** | CT Corporation System |
| **PER:** | Sabra Dudding |
| **ADDRESS:** | 116 Pine Street<br>3rd Floor, Suite 320<br>Harrisburg, PA 17101 |
| **TELEPHONE:** | 717-234-6004 |



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.